Filed 2/1/23; Certified for Publication 2/27/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION FOUR

| | |
|---|---|
| SECURUS TECHNOLOGIES, LLC,<br><br>        Petitioner,<br><br>        v.<br><br>PUBLIC UTILITIES COMMISION,<br><br>        Respondent;<br><br>THE UTILITY REFORM NETWORK et al.,<br><br>        Real Parties in Interest. | B320207<br><br>Commission Decision No. 21-08-037 |

        ORIGINAL PROCEEDINGS; petition for writ of review of a decision by the California Public Utilities Commission (Cal. PUC Decision No. 21-08-037). Decision affirmed.

        Morgan, Lewis & Bockius, F. Jackson Stoddard and Russell M. Blau for Petitioner.

        Christine Hammond, Dale Holszchuh and Elena Gekker for Respondent.

        Edelson and Yaman Salahi; Stephen Raher for Real Party in Interest Prison Policy Initiative, Inc.

## INTRODUCTION

Securus Technologies, LLC (Securus), is one of six telecommunications companies providing incarcerated persons calling services (IPCS) in California. In this original proceeding, Securus challenges the decision of the California Public Utilities Commission (PUC) adopting interim rate relief for IPCS in the first phase of a two-phase rulemaking proceeding. Among other things, the PUC's decision: (1) found IPCS providers operate as locational monopolies within the incarceration facilities they serve and exercise market power; (2) adopted an interim cap on intrastate IPCS rates of $0.07 per minute for all debit, prepaid, and collect calls; and (3) prohibited providers from charging various ancillary fees associated with intrastate and jurisdictionally mixed[1] IPCS. The interim rate cap and prohibition on ancillary fees will remain in place until the PUC adopts a subsequent decision in the next phase of its rulemaking proceeding, which remains open.

We granted Securus's petition for writ of review to consider its request that we invalidate the PUC's decision. In support of its request for relief, Securus contends the decision is unsupported by substantial evidence, is arbitrary and an abuse of discretion, ran afoul of certain procedural requirements, and violated Securus's constitutional rights.

As discussed below, we conclude Securus has not shown the decision must be set aside. Accordingly, we affirm the PUC's decision.

---

1    A call is "jurisdictionally mixed" if the end points of the call cannot definitely be determined. (See fn. 15, *post*, and related text.)

## BACKGROUND

### I.    Federal Regulation of Interstate IPCS

The Federal Communications Commission (FCC) began regulating interstate IPCS in 2012, when it opened a rulemaking proceeding to address concerns regarding a lack of competition in the IPCS market. The next year, in FCC Order No. 13-113, the FCC determined rates for calling services used by incarcerated people greatly exceeded the reasonable costs of providing those services, and adopted interim interstate rate caps of $0.21 per minute for debit and prepaid calls, and $0.25 per minute for collect calls.

In October 2015, the FCC issued an order (FCC Order No. 15-136) "adopt[ing] a comprehensive framework for interstate and intrastate [IPCS]." Among other things, the FCC adopted permanent interstate and intrastate rate caps of $0.11 per minute for prisons, $0.14 per minute for jails with average daily populations of 1,000 or more, $0.16 per minute for jails with average daily populations of 350 to 999, and $0.22 per minute for jails with average daily populations of less than 350. The FCC also "establish[ed] a limited list of ancillary fees that [it] will permit [IPCS] providers to charge[,]" and capped the amounts that could be charged for those fees. Of relevance to this case, the FCC: (1) capped automated payment fees[2] at $3.00 per

---

2      Automated payment fees are those charged by IPCS providers for various types of transactions, including credit card payments, debit card payments, and various other bill processing fees. These fees are incurred when incarcerated persons or their families use a credit or debit card to fund their IPCS accounts for future calls.

3

transaction; (2) capped live agent fees[3] at $5.95 per interaction; (3) capped paper bill/statement fees[4] at $2.00 per statement; and (4) with respect single-call and related services fees[5], prohibited providers from charging more than the exact fee charged by third-party financial institutions for processing single-call transactions, with no markup.

In 2016, the FCC reconsidered its decision to exclude all site commission payments[6] from the rate caps set in 2015. "[T]o account for claims that certain correctional facility costs reflected in site commission payments are directly and reasonably related to the provision of [IPCS]" (footnote omitted), the FCC adopted the following revised rate caps: $0.13 per minute for prisons; $0.19 per minute for jails with average daily populations of 1,000 or more; $0.21 per minute for jails with average daily populations

---

3      Live agent fees are those associated with the optional use of a live operator to complete IPCS transactions. Live agents, for example, may assist in setting up an account, adding money to an account, or making a call.

4      Paper bill/statement fees are fees associated with providing paper billing statements to IPCS customers.

5      Single-call and related service fees apply where an incarcerated person makes a collect call to a recipient who does not have an account with the IPCS provider or does not want to establish an account. Those calls are billed on a per-call basis through a third-party, who charges a transaction fee.

6      Site commissions are a percentage of calling service revenues that IPCS providers pay to incarceration facilities. They are individually negotiated in the contracts between the providers and the facilities they serve, and can vary at the local, county, state, and federal levels.

of 350 to 999; and $0.31 per minute for jails with average daily populations of less than 350.

In 2017, the United States Court of Appeals for the D.C. Circuit vacated various portions of FCC Order No. 15-136. (*Global Tel\*Link v. FCC* (D.C. Cir. 2017) 866 F.3d 397, 402.) Among other things, the D.C. Circuit vacated the FCC's caps on intrastate IPCS rates, reasoning they "exceed[ed] the FCC's statutory authority[.]" (*Ibid.*) It also vacated the FCC's 2015 rate caps on interstate calls, concluding several of the methods used to set those caps were unsupported by reasoned decision-making. (See *ibid.*) Subsequently, in *Securus Techs., Inc. v. FCC* (D.C. Cir. Dec. 21, 2017, No. 16-1321) 2017 U.S. App. LEXIS 26360, the D.C. Circuit summarily vacated the FCC's 2016 order adopting revised rate caps because they were "premised on the same legal framework and mathematical methodology that [the court] rejected in *Global Tel\*Link v. FCC*, [*supra*, 866 F.3d 397]."

In an order adopted in August 2020 (FCC Order No. 20-111)[7], the FCC: (1) revised certain limitations on ancillary service fees; (2) proposed to lower the interstate rate caps on debit, prepaid, and collect calls to $0.14 for prisons and $0.16 for jails; and (3) proposed to cap rates for international calls. While the FCC believed these actions "will ensure that rates and charges for interstate and international [IPCS] are just and reasonable[,]" it acknowledged "the vast majority of calls made by incarcerated individuals are intrastate calls[.]" The FCC therefore "urge[d] [its] state partners to take action to address the egregiously high intrastate [IPCS] rates across the country."

---

7       We refer to this order throughout this opinion as the FCC's August 2020 order.

In May 2021, the FCC adopted an order (FCC Order No. 21-60)[8] "lowering interstate rates and charges for the vast majority of incarcerated people, limiting international rates for the first time, and making other reforms to [its] rules." Among other things, the FCC adopted an interim rate cap of $0.12 per minute for debit and prepaid interstate calls from prisons, and $0.14 per minute for larger jails. However, it "refrain[ed] from adopting new interim rate caps for jails with average daily populations below 1,000, which remain subject to the interstate total per-minute rate cap of $0.21."

In addition, the FCC "[r]eformed the current treatment of site commission payments to permit recovery only of the portions of such payments related specifically to calling services . . . ." For "site commission payments result[ing] from contractual obligations or negotiations with providers, providers may recover from consumers no more than $0.02 per minute for prisons and $0.02 per minute for larger jails . . . ." Thus, under the FCC's May 2021 order, "the maximum total interstate rate caps are $0.14 per minute for prisons and $0.16 per minute for jails with 1,000 or more incarcerated people."

## II.    Overview of the IPCS Market in California[9]

"IPCS in California are generally provided by private communications companies under contract with the entity that oversees or owns the correctional or detention facility. While

---

8    We refer to this order throughout this opinion as the FCC's May 2021 order.

9    In setting forth this portion of the background, we quote from undisputed portions of the challenged PUC decision. All footnotes have been omitted from the quoted passages.

incarceration facilities may be owned or operated, either in whole [or in] part, by a private company, the facilities still are ultimately governed under contract with federal, state, county, or city government entities." Securus is one of six IPCS providers in California.

"Incarceration facilities typically limit provision of IPCS within a facility to one provider and often collect [site] commission fees for their own purposes pursuant to Penal Code section 4025." Thus, "[i]ncarcerated people are effectively a captive customer class who have no choice in service provider and the end result is that there are no reasonably available substitutes for incarcerated persons and their families to choose from."

"Some 354 federal, state, and local correctional and detention facilities exist in California, detaining or incarcerating some 172,543 – 183,011 persons." "The Federal Bureau of Prisons operates federal prisons and detention centers as well as federal immigrant detention facilities and military prisons. The State of California incarcerates individuals in state prisons, correctional facilities, vocational institutions, medical facilities, four juvenile facilities, and approximately 43 'Conservation Camps.' The California Department of Corrections and Rehabilitation (CDCR) oversees these state facilities[.]" "On March 1, 2021, the [CDCR] announced it had negotiated a statewide contract with the IPCS provider GTL to provide intrastate IPCS . . . at the price of $0.025 per minute to 90 state-run facilities, effective through 2026."

"California counties operate county jails for adults, including court holding facilities, temporary holding facilities, and long-term jails. California counties also manage approximately 70 juvenile detention centers and camps.

California cities also sometimes operate jails or holding facilities. Fifty-eight county sheriffs and probation chiefs negotiate their contracts independently with IPCS providers."

## III. Initiation of Underlying Rulemaking Proceeding

Responding to the call to action from the FCC's August 2020 order, in October 2020, the PUC instituted a rulemaking proceeding to consider whether and how to regulate IPCS in California. Through this proceeding, the PUC sought "to ensure that incarcerated people in [California] pay just and reasonable rates for telecommunications service, under just and reasonable terms and conditions." The PUC categorized the proceeding as ratesetting and preliminarily determined hearings might be necessary.

In January 2021, the assigned commissioner filed a Scoping Memo and Ruling pursuant to Public Utilities Code section 1701.1 and article 7 of the PUC's Rules of Practice and Procedure. Therein, the commissioner "set[ ] forth the issues, need for hearing, schedule, category, and other matters necessary to scope [the rulemaking] proceeding." In so doing, the assigned commissioner bifurcated the rulemaking proceeding into two phases.

In Phase I, the PUC would take "expedited action to adopt interim relief for inmates and their families by mid-2021." The commissioner noted the need for this "[s]wift action" was "in part due to the critical importance of supporting continued family contact during the COVID-19 pandemic, which has hit incarceration and detention facilities particularly hard." (Footnote omitted.) Among other issues, Phase I would address whether and how the PUC should "provide immediate interim relief to meet the inmate communication service needs of

8

incarcerated people and their families at just and reasonable rates," and whether and how the FCC's regulations on interstate and international IPCS should inform the PUC's approach to intrastate IPCS.

Subsequently, in Phase II, the PUC would consider other matters relating to the regulation of IPCS, including the setting of rate caps, addressing accessibility of services for contacting non-incarcerated people with communication disabilities, identifying and correcting unacceptable conditions relating to IPCS, and other issues. The PUC planned to hold evidentiary hearings as needed to resolve contested issues of material fact in Phase II.

## IV.   Staff Proposal and PUC's Adoption of Interim Relief

On April 2, 2021, the PUC invited parties to comment on a proposal by its Communications Division Staff (Staff) regarding interim rate relief for IPCS (Staff Proposal).

In the Staff Proposal, the Staff found "the intrastate per-minute-of-use rates and ancillary service rates being charged to inmates in California to be unreasonable." The Staff therefore "recommend[ed] the [PUC] take immediate action to institute interim rate relief." Specifically, the Staff advised the PUC to: (1) adopt the FCC's rate caps implemented in 2013 ($0.21 per minute for debit and prepaid calls and $0.25 per minute for collect calls), which were still in effect at the time; (2) adopt the FCC's restrictions on several ancillary fees, including single-call and related services fees, automated payment fees, live agent fees, and paper bill fees; and (3) prohibit IPCS providers from charging any other ancillary service fees not specified in the Staff Proposal.

9

Subsequently, the Staff modified the Staff Proposal in light of the FCC's May 2021 order. The revised Staff Proposal recommended that the PUC "adopt the FCC rate caps of $0.14 per minute for prisons and $0.16 per minute for jails[ ]" (footnote omitted), but "d[id] not recommend the [PUC] adopt the interim rate cap of $0.21 per minute for jails with an average daily population below 1,000 . . . ." In addition, the revised Staff Proposal "eliminated the single-call service charge from the list of authorized ancillary service charges."

On July 12, 2021, the PUC released a proposed decision adopting interim rate relief for IPCS (Proposed Decision) and permitted parties to comment on it.

On August 23, 2021, the PUC issued its decision adopting interim rate relief for IPCS (PUC Decision No. 21-08-037) (Decision). Therein, the PUC first determined it had jurisdiction to regulate IPCS rates and fees under Public Utilities Code[10] section 451. In so doing, the PUC stated: "We find that IPCS providers charge widely varying and, in some cases, excessively high prices in California for the same services, resulting in unjust and unreasonable rates. Further, we find that IPCS providers operate locational monopolies and, whether individually or collaboratively with incarceration facilities, use their monopoly status within facilities to exercise market power."

Subsequently, in adopting interim relief, the PUC declined to follow the recommendations in the revised Staff Proposal. Instead, the PUC "adopt[ed] interim caps on intrastate rates for [IPCS] of seven cents ($0.07) per minute for debit, prepaid, and

10    All further undesignated statutory references are to the Public Utilities Code, with the exception of Penal Code section 4025, which is frequently referred to as "section 4025."

collect calls[,]" (2) "prohibit[ed] the imposition of single-call, paper bill, live agent, and automated payment fees in association with intrastate and jurisdictionally mixed IPCS," and (3) "prohibit[ed] the imposition of any other type of ancillary fee or service fee not explicitly approved in t[he] [D]ecision." The PUC's reasons for taking these actions are discussed in detail in section III of the Discussion below.

On September 22, 2021, Securus filed an application for rehearing of the Decision. The PUC issued a decision denying the application on April 11, 2022 (Decision No. 22-04-038).

## V. Securus's Petition for Writ of Review

On May 11, 2022, Securus filed a petition for writ of review of the Decision. The PUC and real party in interest Prison Policy Initiative filed answers. Securus filed a reply.

On September 8, 2022, this court issued a writ of review.[11]

## DISCUSSION

## I. Scope of Review and Presumption of Correctness

The parties agree the scope of our review is governed by section 1757, subdivision (a). Pursuant to that statute, our role in this case is limited to determining whether any of the following occurred: "(1) The commission acted without, or in excess of, its powers or jurisdiction. [¶] (2) The commission has not proceeded in the manner required by law. [¶] (3) The decision of the commission is not supported by the findings. [¶] (4) The findings

---

11    Securus's request for judicial notice filed concurrently with its petition for writ of review is hereby granted. In addition, good cause appearing, we hereby approve the stipulations filed on September 26 and September 28, 2022.

in the decision of the commission are not supported by substantial evidence in light of the whole record. [¶] (5) The order or decision of the commission was procured by fraud or was an abuse of discretion. [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a).)

"Because the PUC is not an ordinary administrative agency, but a constitutional body with broad legislative and judicial powers, its decisions are presumed valid. [Citation.] Thus, a party challenging a PUC decision has the burden of proving it suffers from prejudicial error. [Citation.] The presumption of correctness of the PUC's findings has consistently been described by our Supreme Court as a 'strong' presumption." (*The Ponderosa Telephone Co. v. Public Utilities Com.* (2019) 36 Cal.App.5th 999, 1012-1013 (*Ponderosa*).)

As noted above, Securus primarily challenges the Decision on procedural (§ 1757, subd. (a)(2)), substantive (*id.*, subd. (a)(4)-(5)), and constitutional (*id.*, subd. (a)(6)) grounds.

## II.  Procedural Challenges

Securus contends the PUC "failed to act in a manner required by law" because it: (1) did not adhere to the procedure set forth in the Scoping Memo and Ruling; and (2) did not hold an evidentiary hearing prior to adopting its interim rate cap as required by section 728. We address each argument in turn.

### A.  Violation of Scoping Memo and Ruling

First, Securus contends the PUC proceeded unlawfully because it violated the procedures set forth in the Scoping Memo and Ruling. Specifically, it appears to argue that by adopting a

12

rate cap and prohibiting certain ancillary fees on an interim basis, the PUC improperly exceeded the scope of the issues to be decided in Phase I of the underlying proceeding. In support, Securus emphasizes that, in the Scoping Memo and Ruling, the PUC stated it would consider whether to adopt rate caps in Phase II, rather than in Phase I.

As Securus correctly observes, the Scoping Memo and Ruling stated that, in Phase II, the PUC would consider the following issue: "Beyond providing interim relief, should the [PUC] set rate caps for intrastate [IPCS] to ensure rates that are just and reasonable, and affordable?" This provision of the Scoping Memo and Ruling, however, did not prohibit the PUC from adopting a temporary rate cap as a form of interim relief in Phase I. Instead, rather than limiting the types of interim relief the PUC may consider in Phase I, the Scoping Memo and Ruling broadly defined the relevant issue as follows: "Should the [PUC] provide immediate interim relief to meet the inmate communication service needs of incarcerated people and their families at just and reasonable rates, including those with communication disabilities? If so, how?"

In addition to imposing no limits on the types of interim relief the PUC may consider in Phase I, the Scoping Memo and Ruling indicated the PUC intended to consider a temporary rate cap as a form of interim relief. On this point, the commissioner stated: "Our work in Phase I will include examining the FCC's adopted and proposed rate and fee caps as starting points or models to provide interim relief to ensure access to just and reasonable communication service rates for California inmates and their families in 2021 on an expedited basis."

Securus does not cite—and we could not locate—any other provisions in the Scoping Memo and Ruling preluding the PUC from granting interim relief in Phase I by temporarily adopting a rate cap and prohibiting IPCS providers from imposing certain ancillary fees. We therefore conclude Securus has not demonstrated the PUC failed to "proceed[ ] in the manner required by law[ ]" (§ 1757, subd. (a)(2)) by violating the procedures set forth in the Scoping Memo and Ruling.

## B.    Evidentiary Hearing Under Section 728

Next, Securus contends the PUC proceeded unlawfully because it did not hold an evidentiary hearing as, it asserts, is required under section 728 before adopting its interim rate cap and prohibiting certain ancillary fees. Section 728 provides, in relevant part: "Whenever the commission, after a hearing, finds that the rates or classifications, demanded, observed, charged, or collected by any public utility for or in connection with any service, product, or commodity, or the rules, practices, or contracts affecting such rates or classifications are insufficient, unlawful, unjust, unreasonable, discriminatory, or preferential, the commission shall determine and fix, by order, the just, reasonable, or sufficient rates, classifications, rules, practices, or contracts to be thereafter observed in force."

The PUC responds with three counter-arguments. First, it contends Securus "waived any objections to a lack of evidentiary hearings by failing to raise this issue [before the PUC] despite [having] multiple opportunities to do so." Second, the PUC asserts section 728 is inapplicable where, as here, a rate cap has been adopted solely on an interim basis to address hardships arising from a public health emergency (i.e., the COVID-19

14

pandemic). Lastly, it argues that even if section 728 applied, the statute does not require full evidentiary hearings.

As discussed below, we agree with the PUC and conclude: (1) Securus forfeited its assertion of error based on the PUC's failure to hold an evidentiary hearing in Phase I; and (2) Securus has not shown section 728 required the PUC to hold such a hearing before adopting the interim relief in the Decision.

Our Supreme Court has noted that "there is nothing remarkable in the concept that one who is entitled to a hearing may waive his right thereto by failing to assert it." (*California Trucking Association v. Public Utilities Commission* (1977) 19 Cal.3d 240, 245, fn. 7.) Applying this principle here, the record reflects Securus participated extensively in Phase I by commenting on the PUC's order initiating the underlying rulemaking proceeding, filing opening and reply comments on the Staff Proposal, and filing opening and reply comments on the Proposed Decision. Securus does not dispute that, in so doing, it did not request an evidentiary hearing, or contend the PUC was required to hold one before adopting an interim rate cap and prohibiting certain fees in Phase I.[12] Nonetheless, Securus maintains it did not forfeit its contention, as the Scoping Memo and Ruling stated the PUC would not hold hearings until Phase

_____

[12]     Acknowledging it "did not use the exact words 'Section 728 hearing,'" Securus suggests it asserted its right to such a hearing when it "requested that any departure from the 2013 FCC rate wait until the submission of cost data[,] which would have required an evidentiary hearing." We reject this argument, as Securus has not shown why cost data could have only been presented to the PUC at an evidentiary hearing. As discussed in section III.B.1 below, Securus could have provided this data along with its comments in Phase I.

15

II, and therefore "could not reasonably have alerted Securus that it must request a hearing during Phase I."

We are not persuaded by Securus's argument on this point. It is true that the Scoping Memo and Ruling's schedule provided for evidentiary hearings in Phase II. Securus, however, does not cite—and we could not locate—any language in the Scoping Memo and Ruling reflecting the PUC would not consider any requests for an evidentiary hearing in Phase I. Nor does the Scoping Memo and Ruling state the PUC would not hold a hearing upon a party's request in Phase I. Thus, on the record before us, we conclude Securus could have requested a hearing in Phase I if it felt one was needed, but did not do so. It therefore has forfeited its assertion of error based on the lack of a hearing before the PUC adopted interim relief in Phase I.

In any event, even assuming Securus had not forfeited its contention, we conclude it has not demonstrated section 728 required the PUC to hold a full evidentiary hearing before adopting the interim relief set forth in the Decision.

In prior administrative orders, the PUC has determined section 728 does not "mandate[ ] evidentiary hearings." (*Order Modifying Decision (D.) 12-05-037, and Denying Rehearing of Decision, as Modified* (Cal. P.U.C. Apr. 18, 2013) No. 13-04-030 [2013 WL 1837160]).) On this point, the PUC "ha[s] previously explained that 'a hearing' in the context of section[ ] 728 . . . means an opportunity to be heard, but does not necessarily mean an evidentiary hearing." (*Ibid.*) We accord "considerable deference" to the PUC's interpretation of section 728 (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 839 (*PG&E*)), and note that by submitting comments

16

throughout Phase I, Securus certainly had the opportunity to be heard on whether and how the PUC should grant interim relief.

We reject Securus's contention the PUC order cited above should not apply here. In support of its argument, Securus observes that the order did not relate to the PUC's consideration of rates; instead, the order pertained to its adoption of a surcharge, for which no hearing was required under section 728. (PUC Decision No. 13-04-030, *supra*.) This distinction, however, does not render the order inapplicable here. Specifically, after finding section 728 did not apply, the PUC explained: "In any event, assuming arguendo that section 728 or section 729 did apply to the proceeding, neither section mandates evidentiary hearings." (*Ibid.*)

In addition, the California Supreme Court decisions cited by Securus do not—as it suggests—establish an evidentiary hearing is required under section 728 where, as here, the PUC adopts a rate cap solely on an interim basis. In those cases, the court briefly noted section 728 requires the PUC to hold a hearing "in true ratemaking proceedings[ ]" (*Southern California Edison Co. v. Public Utilities Com.* (1978) 20 Cal.3d 813, 829 (*Edison*)) before it "promulgate[s] . . . a general rate tariff." (*City of Los Angeles v. Public Utilities Com.* (1975) 15 Cal.3d 680, 698 (*Los Angeles*).) In neither case, however, did the court hold or otherwise suggest a full evidentiary hearing must be held before the PUC may impose temporary restrictions on rates while considering whether and how to regulate them long-term. (See *id.*, at p. 684 [holding the PUC "possess[ed] the power to implement an annual adjustment scheme" to rates charged for telephone services based on providers' "changing federal tax expenses"]; *Edison, supra*, at p. 815 [holding the PUC lawfully

17

required a utility provider "to amortize, by 36 months of billing credit to its customers, substantial overcollections generated by operation of its 'fuel cost adjustment clause'"].)

Accordingly, we conclude Securus has not established the PUC failed to "proceed[ ] in the manner required by law[ ]" (§ 1757, subd. (a)(2)) by adopting the interim relief set forth in the Decision without holding an evidentiary hearing.

## III. Substantive Challenges

### A. Standard of Review

The principles governing review of the PUC's factual findings for substantial evidence are well-settled. "It is for the agency to weigh the preponderance of conflicting evidence, and its findings are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence." (*Ponderosa*, *supra*, 36 Cal.App.5th at p. 1013.) "In other words, if the PUC's findings are supported by any substantial evidence, they may not be set aside. [Citation.] Accordingly, '[t]o accomplish the overturning of a [PUC] finding for lacking the support of substantial evidence, the challenging party must demonstrate that based on the evidence before the [PUC], a reasonable person could not reach the same conclusion.'" (*Ibid*.) "'In determining whether substantial evidence supports a finding, the court may not reconsider or reevaluate the evidence presented to the administrative agency. [Citation.] All conflicts in the evidence and any reasonable doubts must be resolved in favor of the agency's finding and decision.'" (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 596; see also *SFPP, L.P. v. Public Utilities Commission* (2013) 217 Cal.App.4th 784, 794

18

[reviewing court "may not substitute [its] own judgment 'as to the weight to be accorded evidence before the [PUC]'"].)

Likewise, the principles governing review of a decision by an administrative agency for abuse of discretion are well-settled. "When reviewing the exercise of discretion, '[t]he scope of review is limited, out of deference to the agency's authority and presumed expertise: "The court may not reweigh the evidence or substitute its judgment for that of the agency. [Citation.]"' [Citation.] 'In general . . . the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support . . . .' [Citations.] When making that inquiry, the ""court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute."""' (*American Board of Cosmetic Surgery v. Medical Board of California* (2008) 162 Cal.App.4th 534, 547-548, fn. omitted.)

B.     Analysis

1.     **Lack of Data in the Record Regarding Costs of Providing IPCS**

Because it arises numerous times throughout the petition, we first address Securus's contention the PUC acted arbitrarily and abused its discretion by adopting its interim rate cap and prohibitions on ancillary fees without considering data or other evidence relating to the costs providers incur in furnishing IPCS. In support of its position, and acknowledging the cost data was not in the Phase I record, Securus appears to argue: (1) it was the PUC's responsibility to solicit cost data from providers to evaluate whether and how to provide interim relief; and (2)

19

Securus reasonably believed it could not and/or need not submit cost data in Phase I because the Scoping Memo and Ruling "indicated [the PUC] would not consider evidence until Phase II[.]"

We are not persuaded by either of Securus's arguments. With respect to its first contention, Securus does not cite—and we could not locate—any rule in the PUC's Rules of Practice and Procedure or any other legal authority demonstrating the PUC was required to solicit certain evidence from the parties prior to adopting interim relief in Phase I. Nor does Securus cite—and, again, we could not locate—any portion of the record showing the PUC imposed such a requirement upon itself. We acknowledge the Scoping Memo and Ruling stated the underlying rulemaking "proceeding will undertake discovery on the costs of the provision of inmate communication services," and that Phase I would address whether the PUC "[s]hould . . . seek verifiable evidence of the true costs of service providers of inmate communication services[.]" Neither of these provisions, however, required the PUC, on its own initiative, to request cost data from providers before adopting interim relief.

We likewise reject Securus's second argument. While the Scoping Memo and Ruling stated evidentiary hearings would be held in Phase II, it did not state or otherwise suggest the PUC would not consider any evidence until then. Nor did it prohibit parties from offering evidence for the PUC's consideration in Phase I. Indeed, other parties submitted evidence and data to support their comments on the Staff Proposal asking the PUC to grant interim relief by implementing rate caps lower than those set by the FCC. Consequently, Securus has not tendered a reasonable excuse for its failure to submit cost data for the PUC's

20

consideration in evaluating whether and how to adopt interim relief in Phase I.

For the reasons discussed above, Securus has not shown the PUC was responsible for the omission of providers' cost data from the Phase I record, as it contends. Under these circumstances, we conclude Securus has not established the PUC acted arbitrarily or abused its discretion by adopting the interim relief set forth in the Decision without considering cost data.

### 2. Adoption of Interim Rate Cap

To arrive at its interim rate cap of $0.07 per minute, the PUC first relied on Evidence Code section 452, subdivision (h) to "take official notice that the CDCR capped intrastate IPCS rates in California prisons at $0.025 per minute [in March 2021], through 2026." (Footnote omitted.) The PUC determined the CDCR-GTL contract rate "provides an interim benchmark of the costs of providing IPCS at a reasonable rate." It also noted that because site commissions are not permitted in prisons, the CDCR-GTL contract rate "excludes site commission costs."

The PUC then stated: "Building on [the information derived from the CDCR-GTL contract rate], and using the best information before us, we reason that it is unlikely that it costs IPCS providers more than double the cost of providing call services to the California state prison system to provide IPCS to jails of all sizes. The FCC's [May 2021 order] finds that it costs service providers approximately 22 – 25 percent more to provide IPCS to jails with a population greater than 1,000 as compared to prisons. Increasing the $0.025 rate achieved between the CDCR and GTL by the 22 – 25 percent potential cost difference level identified by the FCC results in a rate of $0.031, potentially, for larger jails. Doubling the $0.025 per minute rate achieved in the

21

California state prison system results in a potential rate of $0.05 per minute for all jails." (Footnotes omitted.)

Subsequently, the PUC determined "California IPCS providers should be up to the challenge of matching or beating the $0.05 average per minute rate achieved in other states' prison systems for incarceration facilities of all sizes." Put differently, it found providers could feasibly offer IPCS at $0.05 per minute in California. In so doing, the PUC observed: "Other states are offering rates lower than their adopted caps: for instance, a 2016 New Jersey bill capped in-state call rates at $0.11 per minute but the rate posted for calls by New Jersey Department of Corrections as of May 2021 is just $0.044 per minute. In Illinois, House Bill 6200 (effective January 1, 2018) prohibited the state's corrections department from charging more than $0.07 . . . per minute for calls but as of May 2021, the Illinois Department of Corrections posted rates of $0.009 per minute (effective July 2018). Further . . . as of April 2021, the rate for phone calls from jails in Dallas County, Texas is $0.119 per minute, and in New York City, where jail phone calls are free to families, the rate paid by the city is $0.03 per minute." (Footnotes omitted.) On this record, the PUC "conclude[d] that $0.05 is a reasonable 'base rate' to use to identify an appropriate interim per-minute rate."

The PUC then noted "some California counties currently rely on site commission funds for rehabilitative/educational and other purposes pursuant to Penal Code [s]ection 4025." (Footnote omitted.) Accordingly, the PUC "add[ed] $0.02 per minute" to the $0.05 per minute base rate "to account for potential site commission payments[,]" noting this "mirrors the FCC's action in its [May 2021] [o]rder, for jails with populations larger than 1,000." (Footnote omitted.)

### a. $0.05 Per Minute Base Rate

Securus advances several arguments challenging the PUC's adoption of the $0.05 per minute base rate underlying its interim rate cap. We address each in turn.

First, Securus contends the PUC abused its discretion by relying on the CDCR-GTL contract rate of $0.025 per minute as the starting point for its analysis. Specifically, it argues "the [PUC] erroneously took 'official notice' of the CDCR-GTL [r]ate[ ]" under Evidence Code section 452, subdivision (h). In so doing, Securus emphasizes that in September 2021, the contract was set aside in a mandamus proceeding unrelated to this case. It therefore contends "the CDCR-GTL [r]ate is now 'reasonably subject to dispute' as the benchmark for an interim IPCS rate cap[.]"

Rule 13.10 of the PUC's Rules of Practice and Procedure provides: "Official notice may be taken of such matters as may be judicially noticed by the courts of the State of California pursuant to Evidence Code section 450 et seq." (Cal. Code Regs., tit. 20, § 13.10.) Evidence Code section 452, subdivision (h), in turn, permits judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

We do not agree with Securus's argument. The Decision reflects the PUC took notice of the fact that, in March 2021, GTL agreed to provide IPCS to 90 facilities in California's prison system at a rate of $0.025 per minute for intrastate calls. It is true that the contract has been set aside because GTL sought to charge $1.25 per call for video calls and $0.10 per minute for international calls, in violation of the requirement in the CDCR's

23

and California Department of Technology's request for proposals that bidders' call rates not exceed $0.05 per minute. This later finding on the contract's invalidity, however, did not place into dispute the fact noticed above (i.e., a few months before the Decision was issued, GTL offered to charge $0.025 per minute for intrastate IPCS in California prisons). Therefore, Securus has not shown the PUC erred by taking official notice of the fact at issue.

Next, although not entirely clear, Securus appears to contend the PUC abused its discretion by using the CDCR-GTL contract rate to estimate the costs of providing IPCS in prisons and jails of all sizes. In support of its position, Securus asserts: (1) "[r]ecord evidence demonstrates [the contract rate is] a poor benchmark for the rest of the industry[ ]" because the rate "reflects economies of scale that cannot possibly be approached by any provider serving an individual county or city jail[ ]"; and (2) in contrast with operators of county and local jails, the CDCR may not collect site commissions, which are prohibited in prisons.

We do not agree with Securus's argument for three reasons. First, the PUC did not—as Securus contends—use the CDCR-GTL contract rate as the benchmark of estimating the costs of providing IPCS in all facilities. Instead, in its findings of fact, the PUC stated: "The March 2021 CDCR contract [rate] of $0.025 per minute provides a benchmark of the costs of providing intrastate IPCS at reasonable rates *in prisons*." (Italics added.) Second, we fail to see how Securus's argument on the "economies of scale" reflected in the contract rate is supported by "[r]ecord evidence[,]" as it is unaccompanied by citations to the record. Third, as discussed above, the PUC expressly acknowledged "[t]he CDCR and GTL intrastate IPCS contract rate of $0.025 per minute . . .

24

excludes site commission costs[,]" and separately accounted for those costs in setting its interim rate cap.

Subsequently, Securus contends the PUC employed a flawed methodology when adjusting the $0.025 per minute CDCR-GTL contract rate to account for the differences in IPCS costs between prisons and jails. Specifically, it asserts the PUC arbitrarily applied the FCC's finding on the cost-differential between prisons and large jails "to [estimate the costs for] small *and* large jails." (Italics in original.)

We are not persuaded by this argument because the PUC did not—as Securus appears to contend—simply apply the 22 to 25% cost differential to the CDCR-GTL rate to account for the differences in IPCS costs between prisons and jails of all sizes. Instead, the PUC used the FCC's cost differential as a reference point, noting: "Increasing the $0.025 rate achieved between CDCR and GTL by the 22 – 25 percent potential cost difference level identified by the FCC results in a rate of $0.031, potentially, for large jails." With that in mind as a point of comparison, the PUC then observed: "Doubling the $0.025 per minute rate achieved in the California state prison system results in a potential rate of $0.05 per minute for all jails."

Lastly, Securus appears to argue the record lacks substantial evidence to support a finding that, notwithstanding additional costs associated with site commissions, California IPCS providers could feasibly furnish services at a rate of $0.05 per minute. On this point, it argues the PUC "relie[d] entirely on evidence that is flawed on its face, misstate[d] that evidence . . . , and dr[ew] inferences that cannot be supported by [that] evidence[.]"

25

In reviewing a finding for substantial evidence, we are not restricted to the evidence cited by the PUC. Instead, we """"must consider *all* relevant evidence in the record[.]""""" (*Clean Energy Fuels Corp. v. Public Utilities Com.* (2014) 227 Cal.App.4th 641, 649, italics added.) In so doing, we observe the record contains the following uncontradicted evidence: (1) in March 2021, GTL agreed to provide intrastate voice calls at a rate of $0.025 per minute in California's prison system; (2) 14 other states have prison voice calling rates of $0.05 cents per minute or less; (3) the rates for intrastate calls in some city and county jails in other states are less than $0.05 per minute (e.g., $0.0119 per minute in Dallas and $0.03 per minute in New York City); (4) in Maryland, New Jersey, and Washington, several incarceration facilities with populations below 500 charge less than $0.07 per minute for calls; and (5) nearly 40% of jails in California (85 of 214) charge $0.05 per minute or less for intrastate voice calls. Resolving all reasonable doubts in the PUC's favor, we conclude that, taken together, this evidence could lead a reasonable person to find that, without accounting for site commission costs, California IPCS providers could feasibly charge $0.05 per minute for intrastate calls in prisons and jails.

In challenging the sufficiency of the evidence described above, Securus questions the probative value of rates charged in other states which, in its view, were "cherry-picked" to support adoption of a lower interim rate in California. Securus also questions whether evidence of rates charged in prisons should inform the feasibility of rates charged in jails. In addition, it notes that by showing 40% of jails in California charge rates at $0.05 per minute or lower, the record demonstrates 60% of California jails charge rates higher than $0.05 per minute.

26

Securus argues that based on this information, the PUC should have inferred $0.05 per minute is not a reasonable rate to impose on California jails. These arguments largely go to the weight the PUC should have given to the evidence, and point out other reasonable inferences that could have been drawn therefrom. It is not our role to "'reconsider or reevaluate the evidence presented to the administrative agency[ ]'" (*Uphold Our Heritage v. Town of Woodside, supra*, 147 Cal.App.4th at p. 596) or to disturb "the PUC's factual findings based on . . . undisputed evidence from which conflicting inferences may reasonably be drawn[.]" (*Ponderosa, supra*, 36 Cal.App.5th at p. 1013.)

In sum, for the reasons discussed above, we conclude Securus has not shown the PUC's adoption of $0.05 per minute as the base rate for its interim rate cap was an abuse of discretion or unsupported by substantial evidence.

### b. $0.02 Per Minute Addition for Site Commissions

Securus contends the PUC abused its discretion by adopting its $0.02 per minute "adder" to the $0.05 per minute base rate to account for site commission costs. In support of its position, Securus appears to advance two arguments.

First, Securus contends the PUC erred by adopting the $0.02 per minute adder because it is insufficient to compensate providers for their site commission costs under current contracts. At the heart of this contention is Securus's argument the PUC abused its discretion by adopting the adder without considering evidence of providers' site commission costs. For the reasons discussed in section III.B.1 above, we conclude this argument is meritless.

27

Next, Securus contends the PUC's adoption of the adder runs afoul of Penal Code section 4025. On this point, Securus asserts section 4025 "gives sheriffs discretion to use commission revenues to fund welfare programs, and to pass through the costs of those programs to users of IPCS." It therefore argues that by adopting the FCC's $0.02 per minute cap on site commissions, which is intended to allow providers to compensate facility operators only for the costs they incur directly in providing IPCS,[13] the PUC unlawfully restricts county sheriffs' discretion to collect and use site commissions for statutorily-authorized purposes. As discussed below, we do not agree with this argument.

We begin our analysis with the relevant statutory provisions. Penal Code section 4025, subdivision (d) provides: "There shall be deposited in the inmate welfare fund any money, refund, rebate, or commission received from a telephone company or pay telephone provider when the money, refund, rebate, or commission is attributable to the use of pay telephones which are primarily used by inmates while incarcerated." Subdivision (e) states, in pertinent part: "The money and property deposited in the inmate welfare fund shall be expended by the sheriff primarily for the benefit, education, and welfare of the inmates confined within the jail. Any funds that are not needed for the

---

13     In its May 2021 order, the FCC "f[ound] that contractually prescribed site commission payments do not warrant recovery insofar as they exceed the level needed to compensate a correctional institution for the costs (if any) an institution incurs to enable interstate and international [IPCS] to be made available to its incarcerated people." It ultimately concluded: "Providers may recover up to $0.02 per minute to account for these facility costs."

welfare of the inmates may be expended for the maintenance of county jail facilities. Maintenance of county jail facilities may include, but is not limited to, the salary and benefits of personnel used in the programs to benefit inmates, including, but not limited to, education, drug and alcohol treatment, welfare, library, accounting, and other programs deemed appropriate by the sheriff. Inmate welfare funds shall not be used to pay required county expenses of confining inmates in a local detention system, such as meals, clothing, housing, or medical services or expenses, except that inmate welfare funds may be used to augment those required county expenses as determined by the sheriff to be in the best interests of inmates." (Pen. Code, § 4025, subd. (e).)

Through the statutory text above, the Legislature dictates where site commission payments from IPCS providers must be deposited (Pen. Code, § 4025, subd. (d)) and specifies how those funds must be spent (*id.*, subd. (e)). In so doing, the Legislature impliedly authorizes county sheriffs to collect site commissions. It does not, however, require sheriffs to do so, or mandate the collection of a certain amount. Nor does it require certain costs or inmate welfare programs to be wholly or exclusively funded through site commission revenues. And it does not prohibit the PUC from regulating the amount that may be charged to IPCS users.

In adopting the $0.02 per minute adder, the PUC did not impose any restrictions on the purposes for which sheriffs may use site commission revenues. On this point, the PUC explained: "Although the FCC strictly limited eligible site commission payments [resulting from contractual obligations or negotiations] to those reasonably related to the facility's cost of enabling

29

IPCS . . . , we do not so limit eligible site commission costs today. We do not limit revenue collection within our per-minute cap of $0.07 to only those costs related to a facility's costs to provide IPCS because we wish to allow a reasonable transition period or cushion for counties to identify other funding sources for cost centers currently funded through inmate welfare funds." (Footnote omitted.)

Accordingly, the Decision adopts a temporary ceiling on how much IPCS providers may charge users to account for site commissions, but imposes no limits on how sheriffs may use those funds once received. Thus, even with the $0.02 adder in place, sheriffs retain the authority to collect site commissions. Where those funds are received, sheriffs must deposit them into an inmate welfare account pursuant to section 4025, subdivision (d), and may only use them for the purposes enumerated in subdivision (e). (Pen. Code, § 4025, subds. (d) & (e).) Under these circumstances, we discern no violation of section 4025.

In sum, for the reasons discussed above, we conclude Securus has not demonstrated the PUC abused its discretion by adopting an adder of $0.02 per minute to account for site commissions.

### 3. Elimination of Ancillary Fees

As noted above, the Decision temporarily "prohibit[s] the imposition of any automated payment fees, paper bill/statement fees, live agent fees, and single-call fees in association with intrastate and jurisdictionally mixed calls[.]" In adopting this restriction, the PUC observed "[n]o party provided data on the record" demonstrating "the current uncapped ancillary fees charged in connection with IPCS calls are just or reasonable." The PUC also explained: "[T]he record does not indicate why the

incarcerated and their families should pay service fees not required in commercial calling services, including automated payment fees, paper bill/statement fees, and live operator fees."

Securus contends the PUC erred by prohibiting the fees above for three primary[14] reasons. We address each in turn.

First, Securus argues that the PUC abused its discretion by prohibiting the fees without evidence showing providers will be able to recover the costs of providing ancillary services absent revenues from those fees. In so doing, Securus essentially asserts the PUC acted arbitrarily because it did not consider evidence relating to providers' costs when adopting the interim restrictions at issue. Again, for the reasons stated in section III.B.1 above, we reject this argument.

Next, Securus contends "[t]he Decision gives no meaningful reason for finding that the elimination of most ancillary fees is justified." This is not true. As discussed above, in adopting its interim restrictions on ancillary fees, the PUC explained "the record does not indicate why the incarcerated and their families should pay service fees not required in commercial calling

---

14    In a footnote, Securus also "objects that the [PUC] was without jurisdiction to regulate ancillary services and acted ultra vires in doing so." It further contends the PUC "lacks jurisdiction to regulate fees billed by providers to consumers located outside of California." These conclusory contentions are wholly unsupported by reasoned argument, citations to the record, or citations to legal authority. We therefore treat them as forfeited and decline to address them on the merits. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [points of error raised but unsupported by reasoned argument and citations to legal authority may be treated as forfeited]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [arguments unsupported by necessary citations to the record may be deemed forfeited].)

services . . . ." The Decision reflects this determination is based on the following unchallenged findings of fact: (1) "Providers are currently imposing some 35 ancillary fees in connection with IPCS[ ]"; (2) "Most ancillary service fees and charges found in connection with the IPCS market are not imposed in any other segment of the telecommunications market in California[ ]"; (3) "Fifteen state prison systems have eliminated automated payment/automated deposit fees[ ]"; (4) "As of April 2021, GTL does not impose an automated payment/automated deposit fee on incarcerated persons in multiple facilities in California[ ]"; (5) "Customers not residing in incarceration facilities typically receive paper utility bills or bank statements without paying additional fees[ ]"; (6) "Most telephone corporations and other utilities provide customer services for free, including services such as speaking with a live agent to set up an account, adding money to an account, or assisting with making a call[ ]"; and (7) "IPCS providers did not provide information or evidence to justify the imposition of ancillary service fees not required by commercial calling services on incarcerated persons and their families."

Lastly, Securus contends the Decision must be overturned because it "never specif[ies] which 'jurisdictionally mixed' calls are subject to [its] prohibition[ ]" on certain ancillary fees. Again, this is not true. The PUC expressly adopted the definition of "jurisdictionally mixed calls" set forth in the FCC's August 2020 order. On this point, the Decision first observed, "[I]n the rare cases when a provider cannot definitively determine the end

32

points of a call, the FCC 2020 Order[15] clarifies that the provider should treat the call as jurisdictionally mixed and thus subject to the FCC's ancillary service requirements adopted for interstate calls at that time." Applying that definition, the Decision then states: "[W]hen the end[ ]points of a call cannot be definitely determined, the call should be classified as jurisdictionally mixed, and the . . . ancillary fee requirements adopted here apply."

Accordingly, for the reasons discussed above, we conclude Securus has not shown the PUC abused its discretion by adopting its interim prohibition on certain ancillary fees.

### 4. Findings Relating to Market Power

As noted above, the PUC determined "[p]roviders of IPCS in California operate locational monopolies in the facilities they serve and exercise market power." "The FCC has found a locational monopoly to exist when a location owner attempts to limit the entry of new competition to increase profitability and demand a share of the profits in the form of a locational rent or commission fee." (Footnote omitted.) The Decision "define[s] 'market power' . . . as the ability of a company to sustain prices at levels above those a competitive market would produce." (Footnote omitted.)

In arriving at the conclusion above, the PUC found the IPCS market consists of two markets. In the first market, providers "'compete' for the right to provide IPCS to the incarcerated[.]" In the second market, the incarcerated and their families purchase IPCS from providers. Relying on the FCC's

---

15    The FCC noted "the jurisdictional nature of a call depends on the physical location of the endpoints of the call[.]" (Footnote omitted.)

33

findings set forth in the its May 2021 order, the PUC rejected the contention that competitive forces in the first market prevent the exercise of market power. Among other things, the PUC noted "'[t]he [FCC] has observed that "because the bidder who charges the highest rates can afford to offer the confinement facilities the largest [site] commissions, the competitive bidding process may result in higher rates" [footnote 91]. Thus, even if there is "competition" in the bidding market as some providers assert, it is not the type of competition the [FCC] recognizes as having an ability to "exert downward pressure on rates for consumers."' [footnote 92.]" (Quoting the FCC's May 2021 order, footnote omitted.)

Accordingly, the PUC determined IPCS providers exercise market power in the second market. It explained: "[N]o data provided demonstrates that incarceration facilities have ever selected more than one IPCS provider to serve the same facility. In general no party disputes Staff's conclusion that incarcerated people are a captive customer class who have no choice in service provider. Incarceration facilities are limiting access to the provision of calling services to a single IPCS provider, and thus 'market competition,' in any sense of the word, does not exist for incarcerated users. No competitive forces within incarceration facilities constrain providers from charging rates that far exceed the cost such providers incur in offering service. Incarcerated people must purchase communications services from the facility's IPCS provider and face rates far higher than those charged to other Californians or forego the service." (Footnotes omitted.) The PUC concluded these market dynamics "ha[ve] resulted in highly unequal and in some cases exorbitant rates for IPCS across

incarceration facilities and as compared to current commercial markets."

Securus asserts the PUC erred in concluding IPCS providers operate locational monopolies and possess market power. It appears to raise three arguments in support of its position, which we address in turn.

First, Securus contends the PUC selected the wrong market for its market power analysis. According to Securus, the PUC should have focused on the bidding market in which providers compete for IPCS contracts, and concluded they do not have market power based on "evidence that providers compete 'vigorously' for the right to serve different facilities[,]" and "evidence showing [a] decline in [IPCS] rates[.]"

We do not agree with Securus's argument. As discussed above, the PUC appropriately relied on the findings from the FCC's May 2021 order to conclude that although providers compete amongst themselves to obtain IPCS contracts with individual facilities, the nature of that competition does not drive rates downward. Against the backdrop of those findings, the PUC reasonably inferred declining IPCS rates were not attributable to competition in the provider bidding market. Under these circumstances, we discern no abuse of discretion in the PUC's decision to focus on the IPCS consumer market—rather than the provider bidding market—in analyzing whether providers have market power.

Next, Securus argues that even if the IPCS consumer market were the relevant market, the PUC erroneously found providers exercise market power because the record shows: (1) providers cannot unilaterally raise prices after their bids are accepted; and (2) the commercial telecommunications market is

an improper market for comparison in evaluating whether providers have market power.

We are not convinced by this argument. Even if IPCS providers cannot unilaterally raise rates once their bids have been accepted, they control the rates they offer to charge in those bids at the outset. Thus, post-contractual restrictions on their ability to change rates have no bearing on whether providers exercise market power by creating bids with rates "above those a competitive market would produce[ ]" (footnote omitted), which, once accepted, are locked in via long-term contracts. And, while Securus refers us to evidence showing IPCS providers must implement security-related features not required in the commercial telecommunications market, it did not cite—and we could not locate—any evidence showing how the additional costs incurred in implementing those features render the calling rates between the IPCS market and commercial market incomparable for purposes of ascertaining whether IPCS providers have market power.

Lastly, Securus contends the PUC "erred by finding that IPCS providers operate as 'locational monopolies." On this point, it argues: "[T]he record demonstrates that neither facilities nor IPCS providers are locational monopolies, and site commission payments are not locational rents or shared profits. Rather, at least some components of site commissions are 'costs of doing business incurred by [IPCS] providers.'" In addition, Securus contends "the competitive bidding process used to set rates and terms of services" will "remedy [the] harm from locational monopolies where they exist."

Again, we are not persuaded by these arguments. Securus's contention on the PUC's treatment of site commissions as

locational rents is conclusory and unaccompanied by citations to the record. Moreover, based on the findings in the FCC's May 2021 order discussed above, the PUC could reasonably find the competition in the provider bidding market does not prevent providers from charging "prices at levels above those a competitive market would produce" (footnote omitted), and therefore will not "cure any locational monopoly[,]" as Securus contends.

In sum, for the reasons discussed above, we conclude Securus has not shown the PUC erred by finding providers operate locational monopolies and exercise market power.

## IV.   Constitutional Challenges

### A.   Standard of Review

"Where a PUC decision is challenged on the ground it violates a constitutional right, the reviewing court must exercise independent judgment on the law and the facts, and the PUC's findings or conclusions material to the constitutional question are not final." (*Ponderosa*, *supra*, 36 Cal.App.5th at pp. 1013-1014.)

### B.   Analysis

#### 1.   Contracts Clause

"'Both the United States and California Constitutions contain provisions that prohibit the enactment of laws effecting a "substantial impairment" of contracts[16] . . . .' [Citation.] This

---

16    Article I, section 10 of the United States Constitution states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" Similarly, article I, section 9 of the California Constitution provides: "A . . . law impairing the obligation of contracts may not be passed."

37

constraint applies to public contracts, as well as those between private parties. As suggested by the reference to a *substantial* impairment, not every legislative impairment of contractual relations triggers the contract clause. [Citations.] '[T]he prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.'" (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employee's Retirement Assn.* (2020) 9 Cal.5th 1032, 1074-1075 (*Alameda County*), italics in original.)

When deciding whether legislation unconstitutionally impairs contractual rights, the United States Supreme Court "applies what it characterizes as a 'two-step test.' [Citation.] As a threshold question, the court must determine '"whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." [Citations.] The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected.' [Citation.] In making this determination, 'the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.'" (*Alameda County, supra,* 9 Cal.5th at p. 1075.)

On this step, the Supreme Court has also stated: "[S]tate regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. [Citations.] In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past. [Citations.] The Court long ago observed: 'One whose rights, such as they are, are subject to state restriction, cannot remove them

from the power of the State by making a contract about them.'" (*Energy Reserves Group, Inc. v. Kansas Power & Light Co.* (1983) 459 U.S. 400, 411 [103 S.Ct. 697, 74 L.Ed.2d 569].) Consequently, a party's reasonable expectations are not impaired where the party is involved "in a heavily regulated industry[ ]" (*id.* at p. 413, fn. omitted) and "[p]rice regulation existed and was foreseeable as the type of law that would alter contract obligations." (*Id.* at p. 416.)

"If the state law is found to create a 'substantial' impairment, 'the inquiry turns to the means and ends of the legislation.' [Citation.] To justify the legislation, the state 'must have a significant and legitimate public purpose behind the regulation, [citation], such as the remedying of a broad and general social or economic problem. [Citation] . . . The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests.' [Citation.] If the legislation survives that scrutiny, 'the next inquiry is whether the adjustment of the "rights and responsibilities of the contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption."'" (*Alameda County*, *supra*, 9 Cal.5th at p. 1075.) In this final inquiry, however, "[a] different, more searching analysis occurs when the state legislates an impairment of its *own* contractual obligations because 'the government's self-interest is at stake.'" (*Ibid*, italics in original.) "In general terms, a state's impairment of its own obligations 'may be constitutional if it is reasonable and necessary to serve an important public purpose.'" (*Ibid.*)

In its petition, Securus argues the Decision unconstitutionally impairs contractual obligations because: (1)

39

"The Decision unreasonably impairs obligations under existing government contracts by requiring IPCS providers and governing entities to change all intrastate rates billed and site commissions paid under their existing contracts[ ]"; and (2) "the Decision's impairment of California IPCS contracts is not 'necessary to serve an important public purpose[ ]'" since, as an alternative to adopting its interim rate cap, the PUC could have considered "a waiver process[ ]" or "examined . . . providers' actual costs and IPCS market bidding dynamics in California before adopting any rate caps." In so doing, Securus does not address the multi-step test above, let alone explain how the test applies here to establish its constitutional rights have been violated. Nor does it argue or otherwise demonstrate that a different test ought to apply in this case. "It is not our place to construct theories or arguments" on Securus's behalf to "defeat the presumption of correctness[ ]" of a decision by the PUC. (*Benach v. County of Los Angeles*, *supra*, 149 Cal.App.4th at p. 852; *Ponderosa*, *supra*, 36 Cal.App.5th at p. 1012 [the PUC's "decisions are presumed valid"].) We therefore conclude Securus has not met its "burden of proving . . . prejudicial error" on constitutional grounds. (*Ponderosa*, *supra*, at p. 1012.)

We acknowledge that, for the first time in its reply brief, Securus contends "[t]he PUC substantially impaired [its] contracts." (Bolded text omitted.) Securus also argues that even assuming the PUC's interim rate cap "was justified by a public purpose," it was not "based upon reasonable conditions[.]" In support of both arguments, Securus largely reiterates the PUC's adoption of its interim rate cap and prohibition on certain ancillary fees was arbitrary, capricious, and procedurally improper. We addressed Securus's arguments on these points in

40

sections II and III above and, having determined they are meritless, cannot conclude Securus has shown a constitutional violation based thereon.

### 2. Confiscatory Rates Amounting to a Taking

The Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to states under the Fourteenth Amendment, "'protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory.'" (*Ponderosa*, *supra*, 36 Cal.App.5th at p. 1015.) "The burden is on [the utility] to show the rate of return (or cost of capital) established by the PUC was clearly confiscatory. That is, there must be a clear showing the rate of return was *'so "unjust" as to be confiscatory*,' such as by demonstrating the rate is so unreasonably low it will threaten the utility's financial integrity by impeding the utility's ability to raise future capital or adequately compensate current equity holders. [Citations.] A rate of return lower than the utility asserts is necessary may nevertheless be reasonable or within a range of reasonableness, constitutionally speaking, if it is "'higher than a confiscatory level.'"" (*Id.* at p. 1016, italics in original.) "Moreover, the facts presented must clearly show the PUC's decision denied [the utility] [its] constitutional rights. '[M]erely asserting in general language that rates are confiscatory is not sufficient . . . . [I]n order to invoke constitutional protection, the facts relied on must be specifically set forth and from them it must clearly appear that the rates would *necessarily* deny to [the utility] just compensation and deprive it of its property without due process of law.'" (*Id.* at p. 1017, italics in original.)

Securus contends the PUC's interim rate cap of $0.07 per minute is confiscatory. In support of its argument, Securus relies

41

on the following facts: (1) the interim rate cap is lower than the rate caps adopted by the FCC in 2021; and (2) over 60% California jails currently charge rates higher than $0.05 per minute for IPCS. We reject this contention. The facts above simply do not—as Securus contends—demonstrate Securus "cannot recover its costs (including a reasonable rate of return)" under the interim rate cap and do not amount to a "clear showing" that a rate of $0.07 per minute "is so unreasonably low" that "it will threaten [Securus's] financial integrity[.]" (*Ponderosa, supra*, 36 Cal.App.5th at p. 1016.) Thus, Securus has again failed to satisfy its "burden of proving . . . prejudicial error" on constitutional grounds. (*Id.* at p. 1012.)

## DISPOSITION

We affirm PUC Decision No. 21-08-037. Respondent PUC and real party in interest Prison Policy Initiative shall recover their costs in this proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(A).)


CURREY, J.

We concur:


COLLINS, Acting P.J.


SCADUTO, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.

Filed 2/27/23
IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION FOUR

| | |
|---|---|
| SECURUS TECHNOLOGIES, LLC, <br><br> Petitioner, <br><br> v. <br><br> PUBLIC UTILITIES COMMISSION, <br><br> Respondent; <br><br> THE UTILITY REFORM NETWORK et al., <br><br> Real Parties in Interest | B320207 <br><br> Commission Decision No. 21-08-037 |

THE COURT:*

The opinion in the above-entitled matter, filed on February 1, 2023, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be certified for publication in its entirety in the Official Reports and it is so ordered.

There is no change in judgment.

_____
* CURREY, Acting P.J.        COLLINS, J.        SCADUTO, J.†

† Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.

1